**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                               )

**NICHOLAS COX,**                )
                               )

       **Plaintiff,**         )
                               )      **Civil No.**

       **v.**                 )      **12-11817-FDS**
                               )

**SERGEANT DETECTIVE PAUL MURPHY,**  )
**OFFICER SEAN FLAHERTY,**        )
**DETECTIVE BRIAN SMIGIELSKI, and**   )
**THE CITY OF BOSTON,**         )
                               )

       **Defendants.**        )
_____)

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTIONS TO STRIKE STATEMENTS OF FACT**

**SAYLOR, J.**

       This is a civil rights action arising out of an incident in which two Boston Police Officers are alleged to have used excessive force during the course of an arrest. The complaint alleges three causes of action: a claim under 42 U.S.C. § 1983 against three officers for excessive force in violation of the Fourth Amendment (Count One); a claim against the officers under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (Count Two); and a claim under 42 U.S.C. § 1983 against the City of Boston alleging a custom and policy of deliberate indifference arising from a failure to train, supervise, and discipline officers who use unreasonable force (Count Three). The named defendants are Sergeant Detective Paul Murphy, Officer Sean Flaherty, Detective Brian Smigielski, and the City of Boston.

       The City has moved for summary judgment as to Count Three and to strike plaintiff's statement of disputed material facts. Plaintiff opposes those motions, and has filed his own

cross-motion to strike the City's statement of undisputed material facts.  For the reasons described below, the competing motions to strike statements of fact will both be denied.  The City's motion for summary judgment will be granted in part and denied in part.

## I.        Cross-Motions to Strike Statements of Material Facts

The City of Boston has filed a motion to strike plaintiff's Local Rule 56.1 statement of disputed material facts along with the corresponding portions of plaintiff's opposition memorandum to the City's motion for summary judgment.  Plaintiff, in turn, has filed a cross-motion to strike the City's statement of undisputed facts, and requests that the Court summarily deny the City's summary judgment motion.

The City of Boston contends that plaintiff's entire statement of material disputed facts should be struck because it fails to specify which particular facts are disputed and which are not.  Plaintiff's amended statement of disputed material facts undoubtedly includes some facts that are not, in fact, disputed.  However, plaintiff's facts are reasonably concise and accurately cite to the record.  Under the circumstances, the Court has little trouble in discerning the disputed facts from those that are included merely for background or context.  Moreover, whether the facts are disputed or not, they must be taken in the light most favorable to the plaintiff for the purposes of the City's motion for summary judgment and thus there is no prejudice to the City in the Court's consideration of those facts.  The City's motion to strike plaintiff's statement will therefore be denied.

Plaintiff contends that the City's statement of undisputed facts should be struck because it contains a section of facts (paragraphs 46-61) concerning plaintiff's arrest that are obviously disputed.  The City's statement, however, contains a footnote qualifying those facts and asserting that they are included "only to clarify some topics on which Mr. Cox is unclear."  (Def. SMF at

9, n.4).  Whether or not that is true, the Court finds that the particular "facts" in question are mostly immaterial to the summary judgment analysis given below.  Plaintiff's cross-motion to strike will therefore be denied.

## II.    **Factual Background**

The following facts are presented in the light most favorable to plaintiff except as otherwise noted.

### A.    **The Arrest**

On February 22, 2010, defendant Detective Brian Smigielski observed plaintiff Nicholas Cox engage in what appeared to be a drug transaction in the Orchard Park area of Boston.  (Def. SMF ¶ 21, Ex. C, BPD Incident Report at 3).  Cox remained under surveillance as he began walking on Mount Pleasant Street, where defendants Sergeant Detective Paul Murphy and Officer Sean Flaherty approached him on foot.  (BPD Incident Report at 3).  Murphy and Flaherty were not in uniform.

Cox did not know the names of the officers who approached him, only that one officer was wearing a green army-style jacket and the other a blue or black "hoodie."  (Cox Dep. 90-91).  The officer in the army jacket asked Cox if he had been in an earlier altercation with a woman in the area, to which Cox responded in the negative and continued walking.  (*Id.* at 94).  According to Cox, one of the officers then suddenly placed him in a headlock from behind, and the officer in the army jacket accused him of selling drugs.  (*Id.* at 95).  The officer began choking Cox, making it difficult for him to breathe.  (*Id.* at 98, 124-25).  The officer then tripped Cox, threw him to the ground, and began punching him with a closed fist.  (*Id.* at 95).  The officer in the blue hoodie held Cox's arm so that he could not block the punches.  (*Id.*).  Cox did not attempt to

assault the officers at any time during the incident.  (Murphy Dep. 71).[1]

The punches left Cox bloodied and unable to see out of his right eye.  (Cox Dep. 96, 136-37).  After being released from the police station, his mother took him to the emergency room at New England Medical Center, where the medical staff diagnosed a right orbital fracture.  (*Id.* at 133-34, 155).

Shortly after the arrest, Detective Smigielski wrote an official incident report describing the arrest and the officers' observations of Cox leading up to it.  (BPD Incident Report).  Although Smigielski did not witness the actual arrest himself, he wrote in the report that it was Murphy who hit Cox.  (*Id.* at 3).

Murphy and Flaherty also completed "use of force" reports following the incident in accordance with BPD policy.  (Def. SMF ¶ 111, Ex. E, Murphy Use of Non-Lethal Force Report; Ex. F, Flaherty Use of Non-Lethal Force Report; BPD Rule 304).  Those reports were reviewed by their supervisor, Lieutenant Meade.  (Def. SMF ¶ 113, Ex. G, Letter from Meade to Commissioner Davis).

Sometime after the arrest, Cox's mother filed a complaint with the Internal Affairs Division.  An IAD investigator then interviewed Cox, Murphy, Flaherty, and Smigielski.  (Def. SMF ¶ 114, Ex. EE, IAD Case # IAD2011-0569 Report).  The IAD investigator concluded that Cox had violently resisted arrest, and recommended that that the charges of excessive force against Flaherty and Murphy be found "not sustained."  (Def. SMF ¶ 122, Ex. FF, IAD Case # IAD2011-0569 Report, at 3, Recommendation).

On April 29, 2010, Smigielski wrote a Supplemental Incident Report, in which he changed the name of the officer who struck Cox from Murphy to Flaherty, and stated that the

---

[1]  The officers, of course, dispute many of the details in Cox's version of the arrest.

original report was "incorrect."  (Def. SMF ¶ 107, Ex. C, Supplemental Incident Report at 1).

### B. The City of Boston

From 2001 to 2011, there were 698 citizen complaints filed against Boston police officers alleging improper use of force.  (Pl. SMF Ex. J, IA Data).  Of those 698 complaints, only 18 were "sustained."  Many have remained open for years without resolution.  (*Id.* at 8-10).

### 1. Use of Force Training

Boston Police Department policy allows an officer to use "only that amount of force that is reasonably necessary to overcome resistance in making an arrest."  (Def. SMF 66, Ex. K, BPD Rule 304, § 2).  BPD Rule 304 defines a "reasonable amount of force" as "the least amount of force that will permit officers to subdue or arrest a subject while still maintaining a high level of safety for themselves and the public."  (BPD Rule 304, § 1).  In order to be able to administer force of any kind, officers must complete a course of instruction approved by the BPD's Training and Education Division.  (BPD Rule 304, § 3).

### 2. Use of Force Policies

The BPD requires officers to document all incidents in which force is used.  (BPD Rules 303, 303A, 304).  In addition, all officers must immediately report the use of force to a supervisor when an officer strikes an individual or when a visible injury occurs as the result of an arrest.  (BPD Rule 304, § 7).  The supervisor is then required to conduct an investigation, the results of which are submitted to the supervisor's commanding officer and the Police Commissioner.  (BPD Special Order No. 95-16).  Copies of the report and the investigation are forwarded to the Internal Affairs Division, which tracks the visible injury reports and lists them on an officer's individual IAD history.  (BPD Rule 304 § 7).

### 3. <u>Internal Affairs Complaint Procedures and Investigations</u>

The BPD's Internal Affairs Division investigates alleged police misconduct, reviews complaint investigations for thoroughness and completeness, and analyzes complaint data. (Def. SMF ¶ 76, Ex. M, Bureau of Professional Standards Information, § 7.2). BPD Rules require each investigation to be thorough and to conclude with an investigation report summarizing the evidence. (Def. SMF ¶ 77, Ex. N, BPD Rule 109, Discipline Procedure Part III).

The investigation report must indicate whether the complaint is (1) "sustained"; (2) "not sustained"; (3) "exonerated"; or (4) "unfounded." (BPD Rule 109, Discipline Procedure Part III). A finding of "sustained" means that the investigation disclosed sufficient evidence to support the complaint's allegations. (*Id.*). A finding of "not sustained" means that the investigation failed to prove or disprove the complaint's allegations. (*Id.*). A finding of "exonerated" means that the investigation disclosed sufficient evidence to indicate that the incident occurred, but that the officer's action was proper, legal, and reasonable. (*Id.*). Finally, a finding of "unfounded" means that the investigation revealed that the conduct did not occur. (*Id.*).

### 4. <u>Oversight of Internal Affairs</u>

All IAD investigations are reviewed by the BPD's Anti-Corruption Division for patterns of conduct indicative of corruption. (BPD Rule 113). The ACD conducts its own investigations when any such corruption is suspected. (*Id.*). The ACD must be notified and given an opportunity to review its records before any BPD employee is transferred, promoted, commended, or rated. (*Id.*).

In 2007, the Mayor's Office created a Community Ombudsman Oversight Panel ("CO-OP") to review internal affairs complaints and make recommendations to the IAD. (Def. SMF

¶ 87, Ex. P, Mayor's March 14, 2007 Executive Order).  Findings of IAD complaints that are not sustained, exonerated, or unfounded are eligible for review by the CO-OP.  (*Id.* at Article VI).

###	C.	Sergeant Detective Paul Murphy

Paul Murphy is a sergeant detective in the Boston Police Department.  He has worked at the BPD for 30 years following his graduation from the Boston Police Academy in 1985.  (Murphy Dep. 117-20, 152).  Murphy has made more than 9,000 arrests and has had more than 12,000 public interactions during his career.  (*Id.* at 19, 256).  He has submitted 14 visible-injury reports during his career.  (Def. SMF ¶ 75, Ex. S, Murphy IAD Resume).  He was assigned to the BPD's Drug Control Unit from 2000 until March 2011.  (Murphy Dep. 121-23).

In addition to the current case, Murphy has been named as a defendant in five civil lawsuits, three of which settled, one of which resulted in a verdict in his favor, and one of which is still pending.  (*Id.* at 6-14).  Murphy was first sued in the late 1980s for false arrest in a case that ultimately settled.  (*Id.* at 7).  In 1990 or 1991, Murphy was sued again, this time for false arrest and excessive force.  (*Id.* at 9-10).   That case included a specific allegation that Murphy choked the plaintiff; after a trial, the jury found for Murphy.  (*Id.*).  Murphy was sued a third time, in the early 1990s, in a case in which the plaintiff alleged that Murphy kicked him in the testicles, causing one to rupture.  (*Id.* at 12).  That case also settled.  (*Id.*).  In the late 1990s, Murphy was sued in a fourth case, in which it was alleged that he threw a person across a room and used racial slurs; that case also settled.  (*Id.* at 12-13).  The fifth suit against Murphy also involves a claim for excessive force, and is currently pending.  (*Id.* at 13-14).  Murphy has never been disciplined for any of the incidents involved in those lawsuits.  (*Id.* at 14-17).

In addition to the events described in the five civil suits brought against him, Murphy has also been the subject of numerous complaints to the Boston Police Department's Internal Affairs

Division.

In 1989, Murphy was accused of tackling, choking, and punching a suspect.  (Def. SMF ¶ 86, Ex. U, IA Case # 176-89, at 3).  IAD officers met with the complainant and interviewed Murphy and three other BPD officers.  (*Id.* at 5).  After the complainant failed to appear at scheduled follow-up interviews, the IAD investigator concluded that the complaint should be found "not sustained."  (*Id.* at 2).

In 1993, a second citizen complaint alleging excessive force was filed against Murphy. (Def. SMF ¶ 87, Ex. V, IA Case # 266-93).  According to the complainant, Murphy punched him "three or four times."  (*Id.*)  An IAD investigator interviewed the complainant and received reports from Murphy and two other officers.  (*Id.*)  Curiously, although Murphy denied punching the complainant, the investigator ultimately recommended a finding of "exonerated," indicating that "[t]he action complained of did occur, but investigation revealed that action was proper, legal, and reasonable."  (IA Case # 266-93 Recommendation).

In 1999, a citizen's complaint alleged that Murphy used excessive force and was disrespectful to suspects and bystanders during an arrest at the complainant's house.  (Def. SMF ¶ 89, Ex. X, IA Case # 009-99).  IAD investigators interviewed the complainant, her son, and her husband; obtained reports from Murphy and a detective who witnessed the incident; listened to BPD radio transmissions from the incident; and drafted a detailed investigatory report that recommended that the charges against Murphy be found "not sustained."  (*Id.* 2-12).

In 2002, Murphy was accused of indecently assaulting a young girl.  (Murphy Dep. 240). IAD never questioned Murphy about the incident.  (*Id.*).  In 2004, he was accused of stealing

cash from an arrestee, but was not questioned by IAD about that incident, either.  (*Id.*).[2]

In October 2006, Murphy was accused of punching and kicking a man and hitting him with his baton, and choking the man's sister.  After interviewing the complainant, the complainant's sister, Murphy, and two other BPD officers, the investigator recommended that Murphy be exonerated.  (Def. SMF ¶ 90, Ex. Y, IA Case #238-06, Investigative Report, Disposition).

In November 2007, Murphy was accused of choking a 14-year-old girl; after an investigation, the charge was found "not sustained."  (Def. SMF ¶ 91, IA Case #211-07 Investigative Report, Disposition).

In February 2009, Murphy was accused of choking and punching a man who was later taken to the emergency room.  Officer Flaherty was present during that incident.  After interviewing the man, Murphy, Flaherty, and another officer, the investigator recommended that the charge be found "not sustained."  (Def. SMF ¶ 92, Ex. AA, IA Case # E2009-026, Investigative Report, Disposition).  That incident marked the fourth time Murphy had been accused of choking a suspect, as well as the fourth time he had been accused of punching a suspect.

In September 2009, a citizen complaint was filed against Murphy alleging two counts of use of excessive force.  An IAD investigation determined that the charges should be found "not sustained."  (Def. SMF ¶ 93, Ex. T, Murphy IA Resume, IAD # 2009-069).  The record does not indicate the exact misconduct of which Murphy was accused.

In October 2010, a man filed a complaint alleging that Murphy punched the man's son in

---

[2] The record does not include the actual documentation of those two allegations.  However, it is clear from the context of Murphy's deposition that the two allegations were in fact documented (and marked as exhibits to the deposition), and that Murphy testified he had never been questioned about either.  (Murphy Dep. 240-41).

the ribs and stomach.  (Def. Repl. Ex 6).  Murphy was contacted once by IAD but never interviewed.  (Murphy Dep. 212-15).[3]

In December 2010, Murphy was named with Flaherty in a complaint accusing the two of beating a man, placing a knee into his back, and pushing his face into the ground.  (Def. Rep. Ex. 5, IA Case # E2010-132 Recommendations; Murphy Dep. 207).  That complaint was the seventh to allege Murphy had punched a suspect, and was the fifth excessive force complaint Murphy had received since the beginning of 2009.[4]  After an investigation, IAD recommended that both officers be exonerated.  (Def. Rep. Ex. 5, IA Case # E2010-132 Recommendations).

In 2011, Murphy received an IAD alert because he had received three complaints within a two-year period.  (*Id.* at 297-98).  He does not recall getting any further information, and, to his knowledge, no action was ever taken by the BPD as a result of the alert.  (*Id.*).

Also in 2011, Murphy arrested a man he knew from his work in South Boston.  (*Id.* at 128).  In April of that year, an audio recording of Murphy threatening to beat the man "within an inch of [his] life" was obtained by an assistant district attorney in Roxbury.  The tape was eventually forwarded to IAD, who never questioned Murphy about it.  (*Id.* at 130).  That same month, Murphy was transferred out of the Drug Control Unit.  (*Id.* at 126).

Murphy has also filed multiple use of force reports.  (*Id.* at 272-74, 278, 285-86).  He has never been question by IAD about any of those reports.  (*Id.* at 272-74).

It appears that the most severe discipline Murphy has ever received for any incident was an oral reprimand, which he received for a "respectful treatment" violation.  (IAD Resume, IA# 14007).  Murphy testified that he has never been required to undergo further training or

---

[3] This complaint is not listed in Murphy's IAD Resume.

[4] Those totals include the present case.

otherwise asked to change his behavior at any time.  (Murphy Dep. 295).  In contrast, Murphy

reports he has received the Boston Police Department's "medal of honor" at least five times, and

has received a "Taylor" award three times.  (*Id.* at 166).[5]

###    D.    Officer Sean Flaherty

Defendant Sean Flaherty is a police officer in the Boston Police Department.  He has

worked at the BPD for fourteen years.  (Flaherty Dep. 7, 14).  Flaherty graduated from the

Boston Police Academy in 2001, where he received training on the use of force.  (*Id.* at 59).  He

has submitted ten visible-injury reports during his career.  (Def. SMF ¶ 75, Ex. S, Flaherty IAD

Resume).

In 2007, Flaherty was sued for excessive force for allegedly hitting someone with a

handcuff.  The case settled.  (Flaherty Dep. 9).[6]  The incident underlying the suit appears to have

been the basis for a citizen complaint in which two arrestees complained that Flaherty had used

excessive force during an arrest in 2004.  The investigator ultimately concluded that the use of

force was reasonable and recommended that Flaherty be exonerated.  (Def. SMF ¶ 96, Ex. DD,

IA Case # 154-07 Recommendation, Disposition).  Notably, the investigation was not completed

until more than five years after the complaint was filed.  (Flaherty IAD Resume, IA # 154-07).

In addition to that complaint and the complaint underlying this case, Flaherty has also

been the subject of five other internal affairs complaints.  (Flaherty IAD Resume).  Three of

---

[5] "The William J. Taylor Meritorious Service Award is the highest award available other than those awarded for valor and heroism. It is given once a year at the Annual Awards Presentation Ceremony to distinguish a member whose performance over the previous year is in the highest traditions of Boston Police service. The award is given to one officer per year, upon the recommendation of the Department Awards Board."  (BPD Rule 305, § 3.3).

[6] Flaherty testified that the suit was filed in 2002 or 2003, but IAD report #154-07 indicates it was filed in 2007.  (Def. SMF, Ex. DD, IA Case # 154-07, at 5).  The incident underlying the suit appears to have occurred in 2004.

those additional complaints also involved allegations of excessive force.  (*Id.*).[7]

In September 2003, a complainant accused Flaherty of using excessive force during the booking process.  IAD interviewed the complainant, Flaherty, and four other officers, and ultimately concluded that Flaherty should be exonerated.  (Def. SMF ¶ 95, Ex. CC, IA Case # 221-03 Recommendation, Disposition).

In 2006, an IAD complaint against Flaherty was sustained for "conduct unbecoming, alcohol off duty, and unreasonable judgment."  (Flaherty IAD Resume, IA# 19206).  He was suspended for two days.  (Flaherty Dep. 159; IAD Resume, IA# 19206).  The complaint involved an accusation that Flaherty, while walking home from his car intoxicated, got into a heated argument with his neighbor.  (Flaherty Dep. 155).

In 2010, Flaherty was named with Murphy in a complaint accusing the two officers of beating a man, placing a knee into his back, and pushing his face into the ground.  (Def. Rep. Ex. 5, IA Case # E2010-132 Recommendations; Murphy Dep. 207).  After an investigation, IAD recommended that both officers be exonerated.  (Def. Rep. Ex. 5, IA Case # E2010-132 Recommendations).

In January 2012, Flaherty was accused in a citizen complaint of using excessive force. (Flaherty IAD Resume, IA # IAD2012-0001).  The details of that complaint are not in the record, but Flaherty's IAD Resume indicates that the charge was found to be "not sustained." The latest complaint against Murphy was filed in August 2012; that complaint lists the allegation as "undetermined" and no other details are in the record.  (*Id.*).

## III.   **Legal Standard**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

---

[7] The most recent complaint, IA # IAD2012-0325, is listed as "undetermined."  (Flaherty IAD Resume).

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when

the moving party shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[]

mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that

determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009).  When "a properly supported motion for summary judgment is made, the adverse party

'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party

may not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence."  *Id*. at 256-57.

## IV.    Analysis

The City has moved for summary judgment on Count Three, in which Cox seeks

damages against the City under a theory of municipal liability.  *See Monell v. Dep't of Social

Servs.*, 436 U.S. 658, 691 (1978).  Under *Monell* and its progeny, local governments can be held

liable for alleged constitutional deprivations when those deprivations arise from a governmental

policy or practice.  In addition to establishing a constitutional deprivation, the plaintiff must

show that:  (1) the municipality had a custom, policy, or practice of failing to investigate,

discipline, supervise, or train its officers; (2) this custom, policy, or practice was such that it

demonstrated a "deliberate indifference" to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation. *DiRico v. City of Quincy*, 404 F.3d 464, 468-69 (1st Cir. 2005) (internal quotations omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Monell*, 436 U.S. at 690-92. Practices that are not officially authorized may nonetheless be actionable under *Monell* if they are "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005); *see also Monell*, 436 U.S. at 691 (informal practice must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law").

In substance, Cox asserts two theories against the City. First, he contends that the City failed to supervise and discipline Murphy and Flaherty, which "created an atmosphere" in which the officers "believed they could violate an arrestee's civil rights with impunity." (Pl. Mem. at 3). Second, he contends that "the City's overall pattern of handling excessive force complaints demonstrates its deliberate indifference to constitutional rights." (*Id.* at 3-4).

A.     **Failure to Supervise, Investigate, and Discipline**

The City denies that it has a policy or custom of inadequately training, supervising, investigating, or disciplining officers who use unreasonable force. The City first contends that it has significant written policies in place concerning the use of force, including a written requirement that BPD officers be trained and certified on the use of force and rules mandating the creation of written reports after an officer's use of force. The City has also submitted evidence that—at least on paper—the BPD's Internal Affairs Division has a "robust" system in place for receiving and investigating citizen complaints, and that IAD investigations are

14

ultimately submitted to the BPD Command Staff for final review.  (Def. Mem. at 2).  Finally, the

City argues that the record contains no evidence of inadequate discipline, because there is no

evidence of a single instance in which an officer was found to have used excessive force but was

not disciplined by the City.

As to Murphy and Flaherty specifically, the City contends that "not a single excessive

force complaint against either Murphy or Flaherty was substantiated, despite thorough

investigation by the Internal Affairs Department . . . with respect to each complaint."  (Def.

Mem. at 2) (footnote omitted).

The difficult question at the heart of this case is whether that is sufficient to exonerate the

City as a matter of law.  More specifically, the core question is whether a reasonable jury could

conclude that the City should have looked beyond the formal findings to address the possible

propensity of Murphy and Flaherty to use excessive force, and whether its failure to do so

demonstrated a custom or practice of tacitly condoning or approving the use of that excessive

force.

There can be no question that law enforcement officers have difficult jobs that often

require them to place themselves in dangerous situations.  Many of their interactions with

citizens end in an arrest, and some of those require the use of reasonable force to subdue the

arrestee.   It is to be expected that many arrestees will be unhappy with the use of force, even

reasonable force, and may file citizen complaints alleging that the force used was unnecessary or

otherwise excessive.  Moreover, an accusation of excessive force, like any other accusation, is

easier to make than to prove.  And such accusations frequently arise out of situations in which

the only witnesses are the officers and the suspect.  It is not particularly surprising, then, that

many IAD investigations result in a finding of "not sustained."[8]

Furthermore, the fact that a law enforcement officer may have used excessive force on a particular occasion is not necessarily evidence of a recurrent problem.  Law enforcement officers often have to make split-second decisions, and they will from time to time make mistakes, as all human beings make mistakes.  An isolated instance of excessive force, without more, is not evidence of a custom or practice that would support a *Monell* claim against a municipality.  *See, e.g.*, *Maldonado v. Fontanes*, 568 F.3d 263, 273-75 (1st Cir. 2009); *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989).

Nonetheless, experience and common sense suggest that the paper record may not tell the entire story.  To begin, claims of excessive force are notoriously difficult for citizens to prove.  Many citizens, particularly in poor or minority communities, may be unwilling to file complaints against officers, to pursue those complaints, or to cooperate with investigations into the use of excessive force.  Individuals who are here illegally are particularly unlikely to want to draw law enforcement attention to themselves.  And surely many officers are aware that they are more likely to be believed in a contest of credibility than an arrestee, particularly if the arrestee is a convicted felon.  Of course, the word of multiple officers is likely to carry even greater weight.  And that problem may be exacerbated by a "code of silence" or a similar set of widespread attitudes that inhibits or prevents the reporting of police misconduct.  As a result, there is reason to believe that the use of excessive force is underreported, and that even valid claims by citizens do not always result in a finding of "sustained." [9]

---

[8] As noted, a finding of "not sustained" is entered when the IAD investigator is unable to either prove or disprove the allegations.  The other possible findings are "sustained," "exonerated," and "unfounded."

[9] A survey of police officers conducted by the National Institute of Justice in 2000 found that 84% of police officers agreed (at least to some extent) that their fellow police officers "use more force than is necessary to make an arrest," and that 68% likewise agreed that those officers "respond to verbal abuse with physical force."  U.S. Dept. of Justice, National Institute of Justice, David Weisburd and Rosann Greenspan, *Police Attitudes Towards Abuse of*

Furthermore, complaints of excessive force are not normally distributed randomly throughout police departments.  It has been well-documented for decades that a small percentage of police officers is responsible for a large percentage of citizen complaints of abuse.  *See, e.g.*, U.S. Dept. of Justice, National Institute of Justice, Samuel Walker, Geoffrey P. Alpert, and Dennis J. Kenney, *Early Warning Systems:  Responding to the Problem Police Officer*, NCJ 188565 (July 2001), available at https://www.ncjrs.gov/pdffiles1/nij/188565.pdf.

With that in mind, police supervisors cannot reasonably assume that no problem exists simply because the accusations against a particular officer have never been formally sustained. Among other things, a supervisor could reasonably infer that when an individual officer accumulates a high or disproportionate number of complaints of excessive force or related misconduct, some further action—whether in the form of further investigation, training, discipline, or some combination of those responses—is warranted.  A similar inference might reasonably be drawn when multiple investigations of a particular officer result in a finding of "not sustained" (as opposed to "exonerated" or "unfounded"), or the same officer is named as a defendant in multiple lawsuits for which the municipality ultimately pays a settlement.[10]  Of course, any one of those accusations or claims may be fabricated.  But surely the likelihood that *all* of them are fabricated decreases considerably as the number begins to mount.

For that reason, most of the recent Massachusetts federal cases granting summary judgment to municipalities on *Monell*-type claims are inapposite.  For example, in *Eason v.*

---

*Authority: Findings from a National Study*, NCJ 181312 (May 2000) available at https://www.ncjrs.gov/pdffiles1/nij/181312.pdf.

[10] While cases settle for many reasons, surely the payment of multiple settlements is a sign that at least some of the claims had some degree of merit.  A police supervisor should also be cognizant of the fact that a payment of taxpayer, rather than personal, funds to settle a lawsuit is not likely to serve as a significant deterrent to police misconduct.  Murphy, for example, testified that he did not even know the settlement amounts in the three lawsuits against him that settled.  (Murphy Dep. 7-8, 12-13).

*Alexis*, 824 F. Supp. 2d 236, 245-46 (D. Mass. 2011), the plaintiff conceded that "none of the [Boston] police officers who allegedly laid hands on him during the arrest had any excessive force complaints on their records."  The claim was based "entirely" on the City of Boston's alleged failure to discipline an officer against whom seven citizen complaints had been filed, but who was 40 feet away during the incident, did not pursue or touch the plaintiff, and did not issue any instructions at the scene.  *Id.* at 242, 246; *see also Barker v. City of Boston*, 795 F. Supp. 2d 117, 122-23 (D. Mass. 2011) (finding no deliberate indifference by City of Boston in case involving shooting of mentally ill individual, where the plaintiff identified only two prior incidents in the entire department over a period of 19 years); *McElroy v. City of Lowell*, 741 F. Supp. 2d 349, 353-54 (D. Mass. 2010) (finding no deliberate indifference by municipality where the plaintiff made only conclusory allegations as to inadequate training and supervision and sought to infer a policy from the single incident described in the complaint).  By contrast, in *Semedo v. Elliott*, 2012 WL 2449912 (D. Mass. June 28, 2012), the court denied summary judgment where the plaintiff claimed unlawful arrest based on racial motivation, and produced evidence of 200 complaints against individual officers in the city of Brockton, as well as 12 complaints against 29 officers alleging racial discrimination.

The City relies in part on *Rasmussen v. City of New York*, 766 F. Supp. 2d 399 (E.D.N.Y. 2011), where the court granted summary judgment to the municipality despite extensive evidence of complaints and claims against the two police officers in question.  Among other things, one officer had been the subject of "seven unsubstantiated complaints involving the use of force, veracity, or both," and had been named in seven § 1983 cases; the other had been the subject of "eleven complaints involving use of force, veracity, or both," and had also been named in seven § 1983 cases.  Neither had ever been the subject of any significant discipline.  *Id.* at 409.

The court held that because none of those facts "show that there has been any violation of constitutional rights," there was "no evidence of the predicate fact underlying the alleged custom and policy." *Id.*

The Court respectfully disagrees with that analysis. Under *Rasmussen*, a police officer could continue to engage in excessive force for years, and his supervisors would bear no responsibility of any kind, as long as no actual finding of a constitutional violation had ever been proved in a court of law. While *Monell* sets a high standard for claims against a municipality, *Rasmussen* would set a bar that virtually no plaintiff could ever overcome. The issue is not whether other plaintiffs have proved constitutional violations; it is whether this plaintiff has adduced sufficient evidence that the relevant supervisors were deliberately indifferent to the rights of the citizens with whom Murphy and Flaherty came in contact.

There is no clear standard or precise metric by which the Court can measure whether the claim has reached the appropriate threshold to survive summary judgment. The courts should not lightly infer a municipal policy or practice from a few scattered claims, lest every claim of excessive force engender a *Monell* claim. But neither should the courts blind themselves to reality. As with many issues, the question is to a considerable extent one of degree: while a single accusation of excessive force is not enough, at some point, as the accusations and claims begin to pile up, a critical mass may be reached requiring an affirmative response from supervisors. *See Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (affirming a denial of qualified immunity for police supervisors; "Notice is a salient consideration in determining the existence of supervisory liability"). Put simply, a very large amount of smoke could reasonably compel the inference that there must be at least a small amount of fire.

This is such a case. Nicholas Cox is by no means the first person to allege that Murphy

choked him, punched him, or otherwise used excessive force.  Murphy has been the subject of at

least ten citizen complaints of excessive force or assault, seven of which occurred before Cox's

arrest.  At least four of those involved allegations of choking and four involved allegations of

punching.  One of those complaints involved the alleged choking of a 14-year-old-girl.  Another

involved the alleged choking and punching of a man who wound up in the emergency room.

Of the investigations for which a finding is in the record, three resulted in a finding of

"exonerated," and five resulted in a finding or recommendation of "not sustained."  A finding of

"not sustained" is not a finding of guilt, but it is not the same as a finding that the accusation is

false.  Furthermore, Murphy himself testified that he was never even interviewed or contacted by

IAD in connection with several of the complaints.[11]  One of those involved an allegation that

Murphy had punched the complainant's son in the ribs and stomach.

Another citizen complaint involved an alleged indecent assault on a young girl.  Murphy

---

[11]  In addition, Murphy's deposition testimony as to the department's response to the complaints and
lawsuits filed against him reads as follows:

> Q:  And have you ever been asked to or required to undergo further training arising out of
> any of these investigations?
>
> A:  No.
>
> Q:  Have you ever been asked to undergo any therapy arising out of any of these
> investigations?
>
> A:  No.
>
> Q:  Have you ever been asked to do anything at all by supervisors or Internal Affairs as a
> result of any of these investigations?
>
> A:  No.
>
> Q:  Have you ever been asked to change your behavior in any way by any supervisor at any
> time while you've been a Boston police officer?
>
> A:  No.

(Murphy Dep. 295).

was also accused in 2004 of stealing from an arrestee, and was never questioned about the

incident.  While neither claim involved allegations of excessive force, both were additional

potential danger signals that were part of the mix of information available to his supervisors.

In 2011, after the arrest of Cox, an assistant district attorney obtained a recording of

Murphy threatening to beat a man "within an inch of [his] life."  Murphy was never questioned

about the incident, and was not disciplined in any way.  Although it occurred afterward, the

incident may constitute evidence of a custom or practice of tacitly approving the use of excessive

force.

In addition to citizen complaints, Murphy was the subject of five lawsuits alleging

excessive force, one of which involved an allegation of choking.  Three of those lawsuits settled,

suggesting that there was at least some degree of potential exposure; one resulted in a finding for

Murphy; and one is still pending.[12]  Murphy has never been disciplined for any of those

incidents.

For his part, Flaherty has been the subject of four other excessive force complaints (one

of which occurred after Cox's arrest) and one lawsuit that ultimately settled.  Flaherty was

exonerated in three of those complaints; the fourth, in 2012, was "not sustained."  One of the

matters in which he was exonerated involved the incident that was the basis for the settled

lawsuit.  The only discipline appearing in Flaherty's record is a two-day suspension stemming

from the 2006 citizen complaint that resulted in a "sustained" finding for "conduct unbecoming,

alcohol off duty, and unreasonable judgment."

Given that evidence, a reasonable jury could conclude that the City was on notice as to

the possible propensity of Murphy, or Murphy and Flaherty together, to use excessive force

---

[12] Murphy was found not liable after trial in the fifth suit.

during arrests.  A reasonable jury could further conclude that the City did not take appropriate

action in response, and indeed on some occasions did not even conduct a meaningful

investigation.  Accordingly, there is a genuine issue of material fact as to whether the City's

custom or practice of failing to train, supervise, or discipline the officers demonstrated a

deliberate indifference to plaintiff's constitutional rights, and that the custom or practice was the

direct cause of the alleged violation.  *See Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir.

1996) (reasonable jury could have inferred that police department knew of officer's alleged

"propensity for violence" based on five excessive force complaints received in five years); *see*

*also Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 330, 331 (2d Cir. 1986) (officers could have

viewed city's failure to implement investigative procedures as reflecting indifference to use of

force).  It could further be inferred that the City's failure to take action led the officers to believe

that their conduct would be tolerated, causing Cox's alleged injuries.  *See, e.g.*, *Clark v. Pena*,

2000 WL 35427177, at *9 (W.D. Mich. April 28, 2000) (police department's ineffective citizen

complaint procedures could have led officers to use excessive force); *Comfort v. Town of*

*Pittsfield*, 924 F. Supp. 1219, 1233 (D. Me. 1996) (police chief's management style created an

atmosphere in which officers believed that he would not punish their use of excessive force).

    The Court need not decide whether the evidence as to Flaherty alone would be sufficient

to sustain a *Monell* claim against the City.  Among other things, the parties dispute which officer

was the assailant.  Furthermore, it is at least arguable that the pairing of two officers with

histories such as those of Murphy and Flaherty increased the likelihood that excessive force

would be used, as neither was likely to act as a brake on the other.[13]  Finally, the Court need not

_____

[13] Indeed, a year before Cox's arrest in 2009, Flaherty was present at an incident in which Murphy was
accused of punching a suspect who later went to the hospital.  (Def. SMF ¶ 92, Ex. AA, IA Case # E2009-026).
Then, approximately 10 months after Cox's arrest, Murphy and Flaherty were again accused of using excessive

decide whether plaintiff can sustain his sweeping claim that the entire Boston Police Department had a policy of deliberate indifference to the use of excessive force.  It is sufficient, for present purposes, that plaintiff has adduced sufficient evidence that the City was deliberately indifferent to the use of force by Murphy and Flaherty.

To be clear, the Court is making no finding that Murphy or Flaherty used excessive force on Cox; that they had a propensity to use excessive force; or that their supervisors in the Police Department were aware that they had such a propensity or were deliberately indifferent to that possibility.  It is simply deciding that it cannot rule in the City's favor as a matter of law, and that the claims against the City should be submitted to a jury for resolution.

Accordingly, the City's motion for summary judgment will be denied as to Cox's claim that the City demonstrated deliberate indifference by failing to supervise, investigate, or discipline its officers for the use of excessive force.

### B.    Failure to Train

The complaint also alleges that the City demonstrated a custom and policy of deliberate indifference by failing to adequately train its officers in the proper use of force.  (Compl. ¶ 37(d)).  It is undisputed that the City has a written policy requiring its officers to complete training and become certified in order to be allowed to use force of any kind against a suspect. The record also establishes that both Murphy and Flaherty received training in the use of force before graduating from the BPD Police Academy.  Cox has not submitted any contrary evidence indicating that the City's training on use of force is deficient in any way, nor does he argue the issue in his memorandum of law in opposition to the City's motion.  Thus, the City's motion for summary judgment will be granted insofar as Cox's claim relies on the City's alleged failure to

---

force in a complaint containing allegations of punching very similar to the present case. (Def. Rep. Ex. 5, IA Case #E2010-132).

train officers on the use of force.

**V.** **<u>Conclusion</u>**

For the reasons set forth above,

1) The City's motion to strike plaintiff's statement of material disputed facts is

DENIED;

2) Plaintiff's motion to strike the City's statement of material undisputed facts is

DENIED; and

3) The City's motion for summary judgment is GRANTED in part and DENIED in

part.

**So Ordered.**

/s/   F. Dennis Saylor

F. Dennis Saylor IV

United States District Judge

Dated:  February 12, 2016